IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

Criminal No. ELH-20-0103

PHILLIP DOWNING, JR.,
    Defendant.

**MEMORANDUM OPINION**

Defendant Phillip Downing, Jr. entered a plea of guilty in December 2020 to Count One of an Indictment charging him with possession with intent to distribute cocaine. The plea was tendered pursuant to a Plea Agreement (ECF 26). Under Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a sentence of 84 months of imprisonment. *Id.* ¶ 9.

Downing filed a pro se motion for compassionate release (ECF 39), along with exhibits. Through counsel, he has filed another motion for compassionate release (ECF 47), supported by numerous exhibits. I shall refer to ECF 39 and ECF 47 collectively as the "Motion." The government opposes the Motion. ECF 52. It has also submitted exhibits. And, defendant has replied. ECF 57.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

**I. Background**

In an Indictment filed on March 11, 2020 (ECF 1), Downing was charged with one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count One) and one count of possession of ammunition by a prohibited person, in violation of 18 U.S.C.

§ 922(g)(1) (Count Two).   On December 15, 2020, pursuant to a Plea Agreement (ECF 26), defendant entered a plea of guilty to Count One of the Indictment.

The Plea Agreement included a Stipulation of Facts ("Stipulation").  *Id.* at 10.  According to the Stipulation, on December 9, 2019, defendant was observed engaging in conduct consistent with hand-to-hand drug dealing.  As officers approached the defendant, he tried to flee.  During defendant's flight, he discarded a bag that contained 15 individual baggies.  Defendant was apprehended and searched.  A .38 caliber revolver, loaded with three .38 caliber cartridges, was recovered from defendant's jacket pocket.  Additional cocaine and $294.00 in U.S. currency was also recovered from the defendant.  The baggies were later tested and found to be cocaine.  The defendant agreed that he possessed the cocaine with the intent to distribute it.  *Id.*

In the Plea Agreement, the parties agreed that defendant had a base offense level of 32 under the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") because defendant qualified as a Career Offender under U.S.S.G. § 4B1.1(b)(1).  *See* ECF 26, ¶ 6.  And, as noted, pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a sentence of 84 months of incarceration.  *Id.* ¶ 9.

At the defense request, the Court proceeded immediately to sentencing.  ECF 23.[1]  A pre-plea criminal investigation had been conducted.  ECF 18-2.  It reflected that defendant had committed several prior offenses, including two felony drug offenses committed when defendant was a juvenile.  *Id.* ¶¶ 2, 3.

In terms of the defendant's adult record, the investigation revealed that on January 28, 2009, when defendant was 18 years old, he was convicted of felony drug distribution and sentenced

---

[1] Despite the lack of a presentence report, the Court was provided with ample information to enable the Court to exercise its sentencing discretion.  This included a pre-plea criminal investigation conducted by the U.S. Probation Office in Maryland.  *See* ECF 18-2.

by the Circuit Court for Baltimore City to ten years of imprisonment, with nine years suspended. *Id.* ¶ 5. However, defendant violated his probation on two occasions and received additional periods of incarceration. *Id.* Then, on August 4, 2009, when he was 19 years old, defendant was convicted of possession with intent to distribute CDS, for which he received a short sentence. *Id.* ¶ 6. In March 2011, when defendant was 20 years old, he was convicted of attempted distribution of heroin. *Id.* ¶ 7. He received a sentence of eight years, with all but 18 months suspended. *Id.*

In March 2014, defendant was convicted of possession with intent to distribute cocaine. *Id.* ¶ 8. He received a 12-year sentence, with all but one day suspended. And, in September 2019, defendant was convicted of another felony drug offense, for which he received a sentence of six years, with all but one day suspended. *Id.* ¶ 9. Notably, the underlying offense occurred while defendant was on probation for the offenses referenced in ¶¶ 8 and 9 of ECF 18-2.

According to the pre-plea investigation, the defendant had four offenses that qualified as predicates for the Career Offender designation. ECF 18-2 ¶ 13; *see id.* ¶¶ 5, 7, 8, 9. In addition, the pre-plea investigation noted in ¶ 14 that, if defendant had been convicted of Count Two of the Indictment, he would be deemed an Armed Career Criminal, based on the offenses in ¶¶ 5, 6, 7, 8, 9 of ECF 18-2. And, if so, he would have faced a mandatory minimum sentence of 15 years of imprisonment. *See* 18 U.S.C. § 924(e).

Given that the defendant qualified as a Career Offender, he had an offense level of 32. After deductions for acceptance of responsibility, he had a final offense level of 29. Because the defendant qualified as a Career Offender, he had a Criminal History Category of VI under U.S.S.G. § 4B1.1(b). *See* ECF 18-2, ¶ 13. If defendant were not a Career Offender, however, he would have had a Criminal History Category of V. *See* ECF 18-2, ¶ 12. With an offense level of 29 and

a Criminal History Category of VI, the Guidelines called for a sentence ranging from 151 to 188 months of imprisonment.[2]

At the time of sentencing, defendant was 30 years old.  ECF 18 at 4.  The defense urged the Court to adopt the C plea.  ECF 18 at 5-6.  The Court considered defendant's challenging childhood.  Defendant's mother was shot to death when the defendant was just eight years old. ECF 30 at 4.  Although the defendant's grandfather "stepped in," *id.*, he died when the defendant was thirteen years old.  *Id.* at 5.  The defendant left school in the tenth grade and turned to drugs. *See* ECF 18 at 5.

In accordance with the parties' C plea, I sentenced defendant to 84 months of imprisonment for Count One, with credit from December 9, 2019.  ECF 29 (Judgment).   Defendant is serving his sentence at FCI Bennettsville.  Federal Bureau of Prisons ("BOP") records indicate a projected release date of November 24, 2025.; *see Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Apr. 1, 2022).  Including credit received by defendant for time served, he has served about 28 months of his 84-month sentence, or roughly 33%.

In the Motion, defendant states that he has "maintained a spotless disciplinary record" during his incarceration.  ECF 47 at 4; *see* ECF 47-9.  Moreover, he sought to complete educational and rehabilitative programming.  ECF 47 at 4; *see* ECF 47-10.  But, he claims that restrictions due to COVID-19 "have made it difficult to access the programs."  ECF 47 at 5.

---

[2] At sentencing, the Court inquired as to what the defendant's offense level would have been for the drug offense if defendant were not a Career Offender.  ECF 52-2 (Tr.) at 40.  The Probation Agent believed it would have been a six, before two deductions for acceptance of responsibility.  *Id.*  With an offense level of four and a Criminal History Category of V, the Guidelines would have called for a sentence of four to ten months of imprisonment.  *Id.*  However, the Court is also mindful of the fact that defendant was charged with an offense under 18 U.S.C. § 922(g).

Defendant was evaluated on January 12, 2022, by Michael J. O'Connell, Ph.D., ABPP-F, a forensic psychologist.  *See* ECF 47-1.  Dr. O'Connell states, in part, *id.* at 10 (emphasis in original):

Clinical Opinion

As per the DSM-5 (Diagnostic and Statistical Manual – 5th Edition), at the time of the offense and currently, Mr. Downing would meet the diagnostic criteria of several diagnoses.  Mr. Downing appears to experience brief yet recurrent episodes of depression that include symptoms of anxiety which appear at least partially attributed to his history of trauma.  Mr. Downing would be diagnosed with **Persistent Depressive Disorder with Anxious Distress**.  Mr. Downing appears to have [a] tendency to self-medicate with substances which in turn have impaired his functioning.  More specifically, he would also be diagnosed with **Alcohol Use Disorder, Cannabis Use Disorder** and **Other Hallucinogen (MDMA/ecstasy) Use Disorder**

Further, Dr. O'Connell opines, *id.* at 9-10:

Forensic Opinion

Concerning the offense, there are several mitigating factors that appeared to play a role in the offense.  While not excuses, these factors are relevant to the issue of moral capability or choices shaped by forces he did not choose.

Experiencing the violent death of his mother as a child was a traumatic and destabilizing event.  Research indicates that for a child, the violent death of a parent places the child at risk for a spectrum of psychological disorders and can significantly impact how the child frames issues like safety, trust/attachment, and identity.  Such a loss typically involves complicated grief that includes feelings of rage and acting out behavior.

\*        \*        \*

While he was not afforded mental health treatment, Mr. Downing, who has a genetic proclivity for substance dependence, appeared to medicate his emotional difficulties with substances.  Individuals with depression, like Mr. Downing, can show decreases in concentration and decision making, which could compromise his ability to fully appreciate or care about the long-term consequences of his actions.

\*        \*        \*

In terms of amenability to treatment, Mr. Downing has had substantial periods of his life when he has exhibited prosocial functioning.  His behavior appears

significantly influenced by his environment and not a manifestation of an underlying antisocial personality disorder.

*       *       *

At present, Mr. Downing has been showing evidence of commitment to personal change.  While dealing with the challenge of being incarcerated during a pandemic, Mr. Downing has avoided any disciplinary problems.  He is not an inherently violent person; and I am unaware of any incidents of violence.  He continues to express remorse for his actions and can verbally identify specific concrete steps he needs to take in order to reenter society as a productive member of society.  Mr. Downing has also maintained relationships with his family who appear supportive and seems to have additional motivation to be a stable, present, and healthy father for his son.

The defendant has also submitted a letter to the Court, apologizing for his conduct.  ECF 18-3.  And, several others have written letters in support of the defendant.  *See* ECF 18-4, ECF 18-5, ECF 18-6, ECF 18-7.

Defendant has exhausted his administrative remedies.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, ___ F.4th ___, 2022 WL 905436, at *3 (4th Cir. Mar. 29, 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence, if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 2022 WL 905436, at *3.  This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22

F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 Fed. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v.*

*Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 2022 WL 905436, at *3; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  Moreover, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.

The Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820

Fed. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).  In § 1B1.13 of the United States Sentencing Guidelines ("U.S.S.G."), titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[3]

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for

---

[3] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).  In other words, the policy statement does not apply to the court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283; *see also Hargrove*, 2022 WL 905436, at *3-4.  Consequently, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'"  *Id.* at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized."  *Hargrove*, 2022 WL 905436, at *6.  But, "rehabilitation alone cannot serve as a basis for compassionate release."  *United States v. Davis*, ___ F. App'x ___, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, ___ F. App'x ___, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t).  However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *Harris*, 2022 WL 636627, at *1.

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c).  *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence

reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ."  *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 2022 WL 905436, at *3.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g., United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 2022 WL 905436, at *4; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

11

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169.  Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III. COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[4]  Defendant filed his motion for compassionate release in October 2021.  ECF 39.  At the time, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

---

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). As of April 4, 2022, COVID-19 has infected more than 80 million Americans and caused approximately 982,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Apr. 4, 2022).

For a brief time, this country enjoyed a reduction of COVID-19 cases. In the fall of 2021, the trend seemed favorable. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct.

13

27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months"). Indeed, the Delta variant was thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").

Then, the Omicron variant emerged, both around the world and in the United States, which sparked further cause for concern. It, too, is highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See,*

*e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Recently, however, the number of COVID-19 cases has declined considerably. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   The country is generally returning to some normalcy.

Nevertheless, of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 25, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is

25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

But, the Fourth Circuit has said with regard to compassionate release that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 2022 WL 905436, at *4. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at *5.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social

distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[5]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

---

[5] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[6] Initially, the vaccines were made available to health care

---

[6] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*,

workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 65% of the total U.S. population is fully vaccinated, including 28% of people from ages 5 to 11, 59% of people from ages 12 to 17, 72% of people from ages 18 to 64, and 89% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Apr. 4, 2022).

Moreover, roughly 97.8 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Mar. 31, 2022).  And, federal regulators have recently approved a second booster dose for individuals age 50 and older.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers

---

N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

for Disease Control and Prevention." *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 4, 2022, the BOP had 135,398 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 309,488 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 4, 2022).

As of April 4, 2022, the BOP reported that 118 federal inmates, out of a total population of 135,398, and 140 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19. Moreover, 53,485 inmates and 12,532 staff have recovered from the virus. And, 292 inmates and seven staff members have died from the virus. The BOP has completed 128,823 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Bennettsville, where the defendant is imprisoned, the BOP reported that as of April 4, 2022, out of a total of 1,532 inmates, zero inmates or staff have tested positive, one inmate has died of COVID-19, and 165 inmates and 119 staff have recovered at the facility. In addition, 193 staff members and 1,197 inmates at the FCI Bennettsville complex have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/ben/ (last visited Apr. 4, 2022).

### IV. Discussion

In the Motion, Downing invokes three grounds for finding extraordinary and compelling circumstances justifying compassionate release: that his girlfriend, the mother and caretaker of his

minor child, has become incapacitated; his asthma, which makes him more susceptible to COVID-19; and his rehabilitation efforts while incarcerated.  ECF 47 at 7-16.

As mentioned, compassionate release is a "rare" remedy.  *White*, 378 F. Supp. 3d at 787.  And, it is reserved for the "most grievous cases."  *McCoy*, 981 F.3d at 287.  The Court must make an "individualized assessment[]," *id.* at 286, which may include such factors as rehabilitation and other post-sentencing conduct, the ill health of a family member, and more.  *Harris*, 2022 WL 636627, at *1; *Davis*, 2022 WL 127900, at *1-2; *McCoy*, 981 F.3d at 286-87.  However, "rehabilitation alone cannot serve as a basis for compassionate release."  *Davis*, 2022 WL 127900, at *1.  I conclude that this case does not meet that high bar.

According to Downing, the "principal reason" to find extraordinary and compelling circumstances is that his girlfriend, Whittney Rudd—who is the mother and caregiver of defendant's minor son—has become "incapacitated."  ECF 47 at 7.  As of October 2021, the couple's son was six years old.  *See Id.* at 4.  Downing explains that Rudd was injured in a car accident in April 2021, which has left her "unable to do anything for herself."  *Id.* at 7.  As a result, she is having difficulty caring for the couple's son.  *Id.*  Furthermore, although other family members have been helping to take care of the child, they are unable to provide the level of care he requires.  *Id.*  The Motion asserts that Downing should be released because he is "desperately needed at home."  ECF 47 at 9.

As noted, although U.S.S.G. § 1B1.13 is not controlling in prisoner-initiated compassionate release cases, it "remains helpful guidance . . . ."  *McCoy*, 981 F.3d at 282 n.7.  And, § 1B1.13 recognizes as a ground for finding extraordinary and compelling circumstances "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children."  U.S.S.G. § 1B1.13 cmt. 1(C)(i).

22

However, Downing has not presented adequate evidence to the Court to show that Rudd is, in fact, incapacitated in such a way that would justify compassionate release. *See, e.g.*, *United States v. Evans*, CCB-18-234, 2021 WL 3725421, at *2 (D. Md. Aug. 23, 2021) (denying a compassionate release request so defendant could care for his grandmother, and noting defendant had not "provided any documentation of the seriousness of his grandmother's condition.").[7]

I note that Downing's description of Rudd's medical condition in his submissions to the Court has varied, and little actual documentation or medical records have been provided. In a letter to the Court of August 31, 2021, he claimed Rudd used a wheelchair as a result of her accident. ECF 36-1 at 2. In ECF 39, dated October 18, 2021, he stated that she "injured her neck;" had "migraine headaches;" and felt "dehydrated and low on energy." ECF 39 at 4. But, he did not mention a wheelchair.

ECF 39 includes several attachments. One attachment is a page, apparently from Rudd's health care provider, describing "General Precautions" after a vehicle accident, but it only lists generic symptoms, not any information specific to Rudd. ECF 39-1 at 1. A "Disability Form" for Rudd, dated April 21, 2021 and apparently also from a health care provider, "certif[ied]" that Rudd was "disabled" and "unable to perform [her] work duties," but it pertained only to a two-week period, from April 21, 2021, to May 5, 2021. ECF 39-1 at 2. It also stated that, for that two-week period, she would be receiving physical therapy three times a week. *Id.*

ECF 47 is supported by a statement from Rudd, dated January 1, 2022. *See* ECF 47-2. In the statement, Rudd states that she was "rushed to the emergency room in pain," and that she has since used a neck brace, taken Tylenol (an over-the-counter drug), and was in therapy. *Id.* at 2.

---

[7] The defendant in *Evans* failed to provide documentation as to the condition of the person for whom he sought to care; here the issue is the condition of the existing caregiver. But, the principle is the same.

Rudd also asserts that she "wasn't able to do anything for [her]self," that she is unable to work, and that she has back pain and cannot "stand for too long." *Id.* at 2-3.  However, ECF 47 provides no additional documentation or specifics as to Rudd's condition.

Finally, Downing's reply states that counsel hired a private investigator to interview Rudd and obtain more information about her condition.  ECF 57 at 1.  According to the private investigator, Rudd finished physical therapy and "never used a wheelchair." *Id.*  However, she still "feels pain which comes and goes" and "wears a neck brace." *Id.* at 1-2.  No documentation as to this investigation has been provided.

The submissions make it difficult to assess Rudd's actual medical condition.  As of the time of her interview with the private investigator, which is the most recent information provided to the Court, Rudd stated that she still felt some intermittent pain and used a neck brace.  Based on the available information, it does not appear that Rudd is seriously incapacitated such that she is unable to care for defendant's son, and such that Downing's release from incarceration would be appropriate.

Although the availability of other caregivers is not mentioned in U.S.S.G. § 1B1.13, numerous judges in this District have considered it. *See, e.g.*, *United States v. Wilcom*, PWG-17-343, 2022 WL 799453, at *5 (D. Md. Mar. 15, 2022); *Evans*, 2021 WL 3725421, at *2; *United States v. Gregory*, 538 F. Supp. 3d 562, 569 (D. Md. 2021); *United States v. Boykin*, CCB-18-278, 2020 WL 3886382, at *1 (D. Md. July 9, 2020); *United States v. Ingram*, GJH-15-392, 2020 WL 3183698, at *2 (D. Md. June 15, 2020).  Here, the Motion makes clear that Rudd's parents and grandmother, as well as Downing's sister, have all helped to care for defendant's son. *See* ECF 47-2 at 2-3; ECF 47-5 at 3.

To be clear, the materials also indicate that these caregivers are older, or have other responsibilities, and so may not be able to devote the full attention required to care for the couple's child.  But, this is not an uncommon situation.  It is a sad truth that incarceration often deprives a child of the care and attention of a parent, from whom the child would undoubtedly benefit.  But, this does not render Downing's case a "grievous" one.  *McCoy*, 981 F.3d at 28.

As for medical conditions, asthma is the only condition cited in the Motion as increasing the danger to Downing posed by COVID-19.  *See* ECF 39 at 5; ECF 47 at 10.  The Motion admits that "[t]he severity of his conditions is unclear."  ECF 47 at 10.

Downing's BOP medical records indicate that he has asthma and uses, or has been prescribed, an Albuterol inhaler, but little more.  *See* ECF 47-11 at 5, 40, 63, 65.  A prescription record, dated November 22, 2021, instructs Downing not to use his inhaler daily, but that he may use it up to four times a day as needed to prevent attacks.  *Id*. at 63.

Rulings as to the significance of asthma are mixed. Judge Grimm has noted: "This Court and others have found that the standard of extraordinary and compelling reasons was met during the COVID-19 pandemic where a defendant had a risk of serious complications from COVID-19 based on asthma and other medical conditions …. However, in some cases this Court and others have found that mild asthma alone did not constitute extraordinary and compelling reasons for release." *United States v. Jennings*, PWG-13-046, 2020 WL 4748462, at *4 (D. Md. Aug. 17, 2020) (collecting cases).

Similarly, another court has remarked: "Because the CDC lists moderate to severe asthma as a condition that can increase the risk of severe illness caused by COVID-19, many courts have distinguished between petitioners with mild/moderate asthma to severe asthma when deciding whether the condition constitutes a compelling and extraordinary circumstance justifying

25

compassionate release….Moderate asthma occurs 'where the individual suffers from daily symptoms, experiences nighttime awakenings more than once a week, uses an Albuterol rescue inhaler on a daily basis, and experiences some limitation of normal activities.'" *United States v. Garcia*, 538 F. Supp. 3d 226, 228 (D. Mass. 2021) (internal citations omitted). *See also*, e.g., *United States v. Armstrong*, RDB-19-357, 2021 WL 2806226, at *3 (D. Md. July 6, 2021) (citing CDC guidance, declining to find extraordinary and compelling reasons based on asthma adequately managed by prescriptions); *United States v. Malone*, CCB-13-307, 2021 WL 252559, at *1 (D. Md. Jan. 26, 2021) (asthma alone not sufficient grounds for compassionate release); *United States v. Daniels*, Crim. No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (recognizing that moderate to severe asthma could constitute an extraordinary and compelling reason for compassionate release, but concluding it was not warranted based on medical records indicating asthma is under control; defendant was instructed to use Albuterol only to prevent attack, but not daily).

Based on the available information, it does not appear that Downing's asthma is of sufficient severity to warrant compassionate release.  There is no suggestion that Downing's life activities are significantly limited; to the contrary, his condition appears to be controlled.  As noted, he has been explicitly instructed not to use his inhaler daily, but only to prevent attacks.  And, no other relevant medical conditions have been suggested.

Finally, the Motion notes Downing's rehabilitative record while incarcerated.  In particular, he has completed a drug education program; has improved himself through his faith; expressed remorse; is viewed by other prisoners as a positive example; and does not have a disciplinary record. ECF 47 at 10-12.  The Court applauds the strides that Downing has taken.  But, as noted, "rehabilitation alone cannot serve as a basis for compassionate release."  *Davis*, 2022 WL 127900,

at *1.  And, considering the lack of other adequate justifications for release offered by Downing; the seriousness of his offense; his criminal history and probation violations, as discussed above; and the fact that he has only completed about one-third of his sentence; and the relative leniency of the sentence, I do not find that these rehabilitative efforts tip the scales in favor of extraordinary and compelling circumstances.   Furthermore, I note that Downing's C plea resulted in a significantly lower prison sentence than what would otherwise have been suggested by the Guidelines.

As noted, ECF 47 includes a thorough "Forensic Psychological Evaluation" of defendant, recently prepared by Dr. Michael J. O'Connell, a forensic psychologist, to support the Motion. *See* ECF 47-1.  Dr. O'Connell concludes that Downing "would be diagnosed with Persistent Depressive Disorder with Anxious Distress," as well as alcohol and drug use disorders.  *Id*. at 10. Furthermore, Dr. O'Connell describes "several mitigating factors that appeared to play a role in [Downing's] offense," including his depression and the violent death of his mother when he was a child.  *Id*. at 9-10.  Dr. O'Connell opines that Downing's behavior does not appear to be "a manifestation of an underlying antisocial personality disorder," and that, while incarcerated, defendant has shown "commitment to personal change" by expressing remorse, maintaining family relationships, and avoiding disciplinary problems.  *Id*.

Although the report certainly constitutes an informative assessment of the defendant, the report does not alter my conclusion.  At most, the report is relevant as to Downing's rehabilitation argument for compassionate release.  Yet, it emphasizes circumstances that were largely known at the time of sentencing.  And, as discussed, these mitigating circumstances are outweighed by other factors that militate against compassionate release at this time.

## V. Conclusion

I am sympathetic to Downing's situation.  And, there is no doubt that his rehabilitative record, as well as his desire to help care for his son, are laudable.  However, after careful consideration, and for the reasons expressed above, I conclude that defendant has not established extraordinary and compelling circumstances under the compassionate release statute. Alternatively, even assuming, *arguendo*, that defendant has done so, other considerations, on balance, do not support compassionate release.

Therefore, for the reasons set forth above, I shall deny the Motion, without prejudice.  An Order follows, consistent with this Memorandum Opinion.


Date: April 6, 2022                                         _____/s/_____

                                                                        Ellen L. Hollander
                                                                        United States District Judge